IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TROY SELK,<br><br>           Plaintiff,<br><br>v.<br><br>BRIGHAM YOUNG UNIVERSITY, a Utah non-profit corporation,<br><br>           Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:13-cv-00326-CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

In this case, Plaintiff alleges that Defendant discriminated against him under the Americans with Disabilities Act ("ADA"), 42 USC §§ 12101 *et seq.*, by (1) failing to provide a reasonable accommodation for Plaintiff's disability when upon transferring Plaintiff laterally to a new department Defendant altered the reasonable accommodation it had previously granted Plaintiff and (2) retaliating against him as a result of renewing the request for the preferred accommodation, allegedly resulting in Plaintiff's constructive discharge.

Before the court are Defendants' Motion for Summary Judgment (Dkt. No. 25), Defendant's Objection and Motion to Strike Portion of Declaration of Troy Selk (Dkt. No. 33), and Plaintiff's Objection to Defendant's MSJ Reply Memorandum (Dkt. No. 37). The court heard oral argument on the motion on January 8, 2015. Based upon its careful consideration of the parties' submissions, including at oral argument, and as discussed below, the court GRANTS Defendant's Motion for Summary Judgment (Dkt. No. 25) and therefore dismisses Plaintiff's Complaint (Dkt. No. 2) in its entirety. The court also DENIES as moot Defendant's Objection

(Dkt. No. 33) and DENIES Plaintiff's Objection (Dkt. No. 37) because Plaintiff's contention that Defendant's Reply Brief (Dkt. No. 32) was overlength is unfounded.

**FACTUAL BACKGROUND**

From 1996 until his resignation on July 20, 2012, Plaintiff worked full time at Brigham Young University in various positions in the division of Student Academic and Advisement Services ("SAAS") including as a School Relations representative, an Assistant Director of Communications responsible for recruitment, an admissions and financial aid counselor, the Communications Manager for all organizations within SAAS, and briefly as a counselor to international students in the International Student Services Office ("ISSO"). (Decl. Jim Woodard, Ex. A to Def.'s Mot. Summ. J. 2, ¶ 3 [Dkt. No. 26-1]; File Memo from Delora P. Bertelsen, Ex. 4 to Decl. Jim Woodard [Dkt. No. 26-5].)

In September 2009, Plaintiff was granted FMLA leave by Defendant through November 2009. Plaintiff did not return until April 9, 2010 but Defendant permitted him to return to the position he had held prior to his leave. (Def.'s Mot. Summ. J. 7-8, ¶ 6 [Dkt. No. 25].) Upon his return, Plaintiff presented to management a letter from his psychologist explaining that Plaintiff suffered from depression, ADHD, and sleep apnea, and that he may therefore "benefit from accommodations as he returns to full-time work," which accommodations "may include an office with a window and the freedom to take multiple breaks during the course of the work day." (*Id.* at 8, ¶ 7; Letter from Dr. Alan B. Hansen dated April 9, 2010, Ex. 2 to Decl. Sue DeMartini [Dkt. No. 26-20].)

Defendant complied with the recommended accommodations and provided Plaintiff with an office with a window by having him trade offices with his supervisor Doug Wright. (*Id.*; Selk Depo., Ex. 2 to Pl.'s Resp. 123:11-14 [Dkt. No. 31]; Complaint at 3, ¶ 9.)

Plaintiff's 2010 performance review contained references to interpersonal conflicts with other employees in his department, and his HR record contained notes about other behavioral issues over a period of years, extending into 2011. (*See* Def.'s Mot. Summ. J. at 5-15, ¶¶ 2-5, 9-12, 14-15, 18 [Dkt. No. 25].) A management decision was made to transfer Plaintiff laterally to a new department, a move that was not meant to be punitive in nature but rather to give Plaintiff an opportunity for a fresh start. (*Id.* at 11-12, ¶¶ 13-16; Email from Vernon Heperi dated June 15, 2012, Ex. 8 to Decl. Jim Woodard [Dkt. No. 26-9].[1])

On May 17, 2012, the day that Plaintiff was transferred, he spoke with his new supervisor in ISSO, Sam Brown, and informed him that in SAAS Defendant had previously provided him with an office with a window as a reasonable accommodation for his disability, as recommended by his psychologists' letter. The two discussed the fact that Plaintiff's new division did not have any offices with windows because it was in the basement. Plaintiff proposed that he may in the absence of a window need to take frequent breaks to go outside for natural light. Mr. Brown responded "that should be fine." No one ever complained about the number of breaks that Plaintiff took. (Def.'s Mot. Summ. J. at 11, ¶ 13 [Dkt. No. 25]; Selk Depo., Ex. C to Def.'s Mot. Summ. J. 237-38; 240-41 [Dkt. No. 26-26].)

---

[1] Dean Vernon Heperi is the Associate Student Life Vice President and Dean of Students. He was the head of Plaintiff's new department (ISSO) after his May 17, 2012 transfer from SAAS. Dean Heperi wrote in the June 15, 2012 email that "[a]fter considerable thought and discussion re: the employee's [i.e. Plaintiff's] previous behavior in the workplace, I asked for him to be transferred to my department. I did this willingly and with full understanding that there were previous concerns regarding his behavior in the workplace. . . . My hope was that by providing a new environment for this individual to work in, he would grow, make a contribution in the International Office, and use this opportunity to leave his past behaviors behind." (Dkt. No. 26-9.) The record supports the conclusion, however, and the court finds, that Dean Heperi did not know at this time about the prior accommodation of an office with a window that Plaintiff had received from his supervisors in SAAS. (Decl. Jim Woodard, Ex. A to Def.'s Mot. Summ. J. 8, ¶ 17 [Dkt. No. 26-1]; "Notes to File" dated July 3, 2012, Ex. 15 to Decl. Jim Woodward [Dkt. No. 16-16]; Selk Depo, Ex. C to Def's Mot. Summ. J. 206:20-25 to 207:5 [Dkt. No. 26-26].)

Around the same time as his transfer to ISSO, Plaintiff complained to his new supervisor and HR about not having received a pay raise that year. In the course of these discussions, he also complained about past supervisors and expressed his belief that they had been attempting to undermine him and set him up for failure. (Decl. Jim Woodard, Ex. A to Def.'s Mot. Summ. J. 5, ¶ 10 [Dkt. No. 26-1]; "Notes to File" dated June 14, 2012, Ex. 7 to Decl. Jim Woodard [Dkt. No. 26-8]; "Notes to File" dated June 27, 2012, Ex. 11 to Decl. Jim Woodard, at 1 [Dkt. No. 26-12].) He ultimately met with the head of his new department, Dean Vernon Heperi, on June 15, 2012 to discuss not having received a pay raise directly with him. In response to specific questions from Dean Heperi during this discussion, Plaintiff said that he did not believe he had caused problems for his previous supervisors and represented to Dean Heperi that his past performance reviews were "devoid of any concerns" and were "positive." Dean Heperi expressed his understanding that Plaintiff had "past behavioral issues" that had been "addressed by HR and your supervisors" but assured him that "[y]ou come to my area under no cloud and with full opportunity to use your talents to be successful—if you choose to be successful." But this discussion also prompted Dean Heperi to communicate with Jim Woodard in HR his intention to give Plaintiff a choice between acknowledging past problems and focusing on the job or losing the opportunity to work in his department at BYU. If he chose the former, Dean Heperi intended to place a "formal letter of discipline and warning" in his file but allow him to continue in his position. (Decl. Jim Woodard, Ex. A to Def.'s Mot. Summ. J. 5, ¶ 11 [Dkt. No. 26-1]; Email from Vernon Heperi dated June 15, 2012 [Dkt. No. 26-9].)

Plaintiff's representations to Dean Heperi during the June 15, 2012 discussion that he had not had past behavioral issues and only positive annual performance reviews devoid of problems led Dean Heperi to conclude that he had not been completely honest during that discussion. On

June 22, 2012, Dean Heperi wrote to HR that by reviewing Plaintiff's file after the June 15, 2012 discussion, including past annual performance reviews, Dean Heperi had confirmed that Plaintiff "did have previous behavioral/disciplinary issues in SAAS (This is contrary to the report he gave to both me and Sarah)." This influenced Dean Heperi to conclude that "his current behavior regarding NOT receiving a salary increase is a return to the behavior that contributed to his transfer to Campus Life from SAAS." Dean Heperi therefore planned to meet with Plaintiff to "immediately check and correct his behavior" by giving him the choice referred to above and explaining to him that a formal "letter of warning and probation" would be placed in his file. Dean Heperi intended to require Plaintiff to send him an email acknowledging that "[h]e understands his past behaviors were a concern for supervisors in SAAS"; "[h]e is willing to work in Campus Life without creating any distractions, including those similar to his past behaviors"; and "[h]e is requesting opportunity to continue working in his current assignment." (Email from Vernon Heperi dated June 22, 2012 [Dkt. No. 26-10].)

The meeting occurred as planned on June 25, 2012. Dean Heperi, Plaintiff, Jim Woodard and Sarah Westerberg from HR, and Plaintiff's immediate supervisor in ISSO, Sam Brown, were present. Plaintiff continued to contest Dean Heperi's (and HR's) interpretation of the events recorded in his personnel file and annual performance reviews during that meeting. Jim Woodard met with alone with Plaintiff immediately following that meeting, at which time he

> spent some time outlining for Troy the importance for him to take ownership for these concern areas that Vern identified. I told Troy that if he accepts ownership and works to change Vern's perceptions, then Troy will be successful in Campus Life. I also explained that if Troy does not take ownership for changing these areas of concern, then he will be at risk of termination of his employment. Troy struggled to see that he was responsible to take ownership to change these areas of concern.

5

(Decl. Jim Woodard, Ex. A to Def.'s Mot. Summ. J. 5-7, ¶¶ 11-15 [Dkt. No. 26-1]; "Notes to File" dated June 25, 2012, Ex. 10 to Decl. Jim Woodard [Dkt. No. 26-11].) Jim Woodard sent Plaintiff suggestions of what to include in his email later that day. (*Id.* at 2; Email from Jim Woodard to Troy Selk dated June 25, 2012, Ex. 12 to Decl. Jim Woodard [Dkt. No. 26-13].) Plaintiff ultimately sent the required email to Dean Heperi on June 27, 2012. As a result of that email acknowledging past behaviors and pledging to improve, Dean Heperi decided not to terminate Plaintiff's employment but instead to issue and have Plaintiff sign the final warning letter. (Decl. Jim Woodard, Ex. A to Def.'s Mot. Summ. J. 7, ¶ 15 [Dkt. No. 26-1]; Email from Troy Selk to Vernon Heperi dated June 27, 2012, Ex. 13 to Decl. Jim Woodard [Dkt. No. 26-14].) Plaintiff met with Dean Heperi and Jim Woodard on July 3, 2012 to review and sign the final warning letter. (Decl. Jim Woodard, Ex. A to Def.'s Mot. Summ. J. 8, ¶ 16 [Dkt. No. 26-1]; Final Warning Letter dated July 3, 2012, Ex. 14 to Decl. Jim Woodard [Dkt. No. 26-15]; "Notes to File" dated July 3, 2012, Ex. 15 to Decl. Jim Woodard [Dkt. No. 26-16].)

During the July 3, 2012 meeting to review the final warning letter, Plaintiff also raised the previous accommodation of an office with a window with Dean Heperi. However, Plaintiff never returned to work after that day and resigned his employment on July 20, 2012, despite having been granted more FMLA leave through September 2012 on July 18, 2012. ("Notes to File" dated July 3, 2012, Ex. 15 to Decl. Jim Woodard [Dkt. No. 26-16]; Memo re Resignation dated July 20, 2012, Ex. 15 to Decl. Jim Woodard [Dkt. No. 26-17]; Decl. Sue DeMartini, Ex. B to Def.'s Mot. Summ. J. 4, ¶ 9 [Dkt. No. 26-18] & Letter of July 18, 2012 [Dkt. No. 26-24].) Plaintiff offers no evidence that from the time he was reassigned to ISSO and discussed the accommodation with Sam Brown until the July 3, 2012 meeting he had raised any concern about having an office without a window. Plaintiff offers no evidence that he discussed with Sam

Brown or other supervisors that the accommodation of allowing frequent breaks was not addressing his disability.

## ANALYSIS

I.  **Legal Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See also Celotex v. Corp v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party to set forth specific facts demonstrating a genuine factual issue for trial. *Matsushita Elec. Indus. Co. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); FED. R. CIV. P. 56(e). A genuine dispute as to a material fact "exists when the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Zwygart v. Bd. of Cnty. Comm'rs*, 483 F.3d 1086, 1090 (10th Cir. 2007).

In responding to the motion for summary judgment, the nonmoving party may not rest upon the mere allegations or denials of his or her pleadings, but must produce specific facts, by affidavit or other evidentiary materials provided by Rule 56(e), showing there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In addressing Plaintiff's failure to accommodate and retaliation claims under the ADA, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): Plaintiff must first prove a *prima facie* case of discrimination under the ADA. *Id.* at 802. The burden then shifts to Defendant, the employer, to state a legitimate, non-discriminatory reason for its action. *Id.* The burden then shifts back to Plaintiff to show that the stated reason was merely a pretext for discrimination. *Id.* at 804.

The court has considered the facts presented by the parties and any reasonable inferences drawn therefrom in the light most favorable to Plaintiff as the nonmoving party. In his Response (Dkt. No. 31) and at oral argument, Plaintiff failed to "set forth specific facts showing that there is a genuine issue for trial" through provision of and citation to evidence that would be admissible at trial. In the absence of a genuine issue of material fact, the court finds that Defendant is entitled to summary judgment as a matter of law on both the failure to accommodate and the retaliation claims, including the claim for constructive discharge.

## II.     ADA Failure to Accommodate

"The ADA defines discrimination to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Spielman v. Blue Cross & Blue Shield of Kan.*, Inc., 33 Fed. Appx. 439, 443 (10th Cir. 2002) (quoting 42 U.S.C. § 12112(b)(5)(A)). "The statute thus establishes a cause of action for disabled employees whose employers fail to reasonably accommodate them." *Id.* (citing *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617 (10th Cir. 1998)).

The court notes that "there appears to be some minor disagreement in the Tenth Circuit over what exactly a plaintiff needs to show in order to establish a *prima facie* case of failure to accommodate . . . ." *McNeil v. Wells Fargo Bank, N.A.*, No. 1:12-cv-02064-DME, 2013 U.S. Dist. LEXIS 173382, at *25 (D. Colo. Dec. 11, 2013). For example, in *Allen v. SouthCrest Hosp.*, 455 Fed. Appx. 827, 834 (10th Cir. 2011), the Tenth Circuit held that in order to establish a *prima facie* case of failure to accommodate a disability, a plaintiff must show that "(1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." This is the test cited by Defendant in its Motion (Dkt. No. 25, at 3) from the Seventh Circuit in *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011), though Defendant incorrectly presented it as a Tenth Circuit case. But in *Spielman*, the Tenth Circuit had held previously that to make out a *prima facie* case for failure to accommodate a plaintiff must prove that "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . .; and (4) that the [employer] refused to make such accommodations." 33 Fed. Appx. at 443.

The minor differences in the two tests are, however, irrelevant for purposes of this case. The parties do not dispute Plaintiff's disability and that Defendant was aware of the disability, or that "with reasonable accommodation [Plaintiff] could perform the essential functions of the position." As a result, the court will employ the simpler, more recent articulation of the *prima facie* case as applied in *Allen* and *Kotwica*. Only the third element of the *prima facie* case is at issue: Plaintiff's allegation that "the employer failed to reasonably accommodate the disability."

Specifically, Plaintiff alleges that Defendant revoked the previously granted accommodation of an office with a window when it transferred Plaintiff to a new department that

did not have any offices with windows because it was in the basement of the Wilkinson Center on the campus of Brigham Young University.

The undisputed facts show that Defendant did not fail to accommodate Plaintiff's disability after the transfer. Defendant had previously solicitously accommodated Plaintiff's *preferred* accommodation of an office with a window by giving him his supervisor's office, where he remained for two years. When interpersonal problems arising from Plaintiff's behaviors became too disruptive for the work environment, a management decision was made within Defendant's discretion and business judgment, with which the court should not interfere under such circumstances, to transfer Plaintiff laterally to a different department with a Dean who was willing to give Plaintiff a "fresh start" in relation to these interpersonal issues so that he could succeed in his further employment at BYU.

It is true that Plaintiff's new department did not contain any offices with windows. As a result, on the day that he was transferred, Plaintiff initiated an "interactive process," as was his obligation, to discuss the matter of his previously granted accommodation with his new supervisor. As a result of this conversation, Defendant modified the accommodation from an office with a window and freedom to take multiple breaks to an accommodation allowing Plaintiff to take as many breaks throughout the day as he needed to go outside and get natural light.

Defendant was obligated, under the ADA, to provide Plaintiff with a reasonable accommodation, not necessarily with his preferred accommodation. "[The ADA's] use of the word 'reasonable' as an adjective for the word 'accommodate' connotes that an employer is not required to accommodate an employee in any manner in which that employee desires. This is so because the word 'reasonable' would be rendered superfluous in the ADA if employers were

10

required in every instance to provide employees the maximum accommodation or every conceivable accommodation possible. . . . Stated plainly, under the ADA a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154 (10th Cir. 1999) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285-86 (11th Cir. 1997)).

Here, at the time of the transfer when it became apparent that the previously granted accommodation would no longer be possible simply because the new department had no offices with a window, Plaintiff initiated, and Defendant participated in good faith in, an interactive process to discuss accommodating Plaintiff's disability. "The exact shape of this interactive dialogue will necessarily vary from situation to situation and no rules of universal application can be articulated." *Id.* at 1173. But the court finds that in this case, the interactive process worked as it should, resulting in a new accommodation for Plaintiff of allowing him to take as many breaks as needed throughout the day to go out into the natural light. It might very well be, as Plaintiff argued at oral argument, that this accommodation ultimately would not have been adequate for Plaintiff's conditions. If after some period of experience with the new accommodation it appeared to Plaintiff that the new accommodation was not working, then Plaintiff would have needed to raise the issue again with his immediate supervisor Sam Brown because "the interactive process must ordinarily begin with the employee providing notice to the employer." *Id.* at 1171.

Despite Plaintiff's attempts at oral argument to rehabilitate his claims by arguing that he had, indeed, notified Sam Brown after May 17, 2012 and before his meeting with Dean Heperi on July 3, 2012 that the "unlimited breaks" accommodation was not working, he was not able to present admissible evidence setting forth such facts. The court finds that the present record

supports the conclusion that Plaintiff did not again discuss the accommodation with Sam Brown to inform him that it was proving insufficient to address his needs. Rather, he raised it with the head of his department, Dean Vernon Heperi, as an aside in a meeting on July 3, 2012. The purpose of that meeting was not to discuss a further modification of the current reasonable accommodation that had been granted to Plaintiff of taking as many breaks as necessary throughout the day. Rather, the purpose of the July 3, 2012 meeting was for Plaintiff to review and sign a final warning letter advising him of a probationary period in which he would need to improve behavioral issues arising from his complaints about management's decision not to give him a raise that year as well as the various issues noted in his personnel file.

Nevertheless, at the July 3, 2012 meeting, Plaintiff mentioned the prior accommodation of an office with a window to Dean Heperi. The court finds that this effectively marked the initiation of a new interactive process that, however, could not be continued because Plaintiff never returned to work after that day and ultimately resigned on July 20, 2012 despite having been granted further FMLA leave by Defendant through September 2012. This shows Defendant's good faith effort in the interactive process.

Accordingly, the court finds that Defendant has not failed to accommodate Plaintiff's disability and, in light of the absence of a genuine dispute of material fact, Defendant is entitled to summary judgment on this claim.

### III.    ADA Retaliation

"To establish a *prima facie* case of retaliation under the ADA, [Plaintiff] must show: '(1) that he engaged in protected [activity] . . . , (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the

...

protected activity and the materially adverse action.'" *Jones v. UPS, Inc.*, 502 F.3d 1176, 1193 (10th Cir. 2007) (quoting *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1228 (10th Cir. 2006)).

The court finds that Plaintiff cannot establish a *prima facie* case because he cannot show any "materially adverse" employment action, much less connect that to any "protected activity." Moreover, even if Plaintiff could make such a showing, under *McDonnell Douglas* burden shifting, the burden would then shift to Defendant to articulate a legitimate non-discriminatory reason for the action that has taken place, a burden which Plaintiff does not dispute has been met. (*See* Pl's Resp. 16 [Dkt. No. 31].) Thus, the burden would shift back to Plaintiff to show, by a preponderance of the evidence, that the articulated non-discriminatory reason for the action was pretextual and that the actual intention was to discriminate. Plaintiff cannot show pretext on this record.

### A.   Constructive Discharge

Though Plaintiff does not cite the correct elements of a *prima facie* case for retaliation in his Response (see Pl.'s Resp. 13 [Dkt. No. 31] (citing the elements of a *prima facie* case for general discrimination under the ADA rather than the Tenth Circuit's elements for retaliation cited above)), he advances in his argument a theory that the materially adverse employment action required by the *prima facie* case for retaliation is his "constructive discharge" from employment at BYU, which was effected by his resignation on July 20, 2012.

To succeed on a claim of constructive discharge, Plaintiff must show that he "had no other choice but to quit"; in such a situation, "the conditions of employment must be objectively intolerable." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir. 1998). Because this is an objective test, "the plaintiff's subjective views of the situation are irrelevant," *id.*, as is the employer's subjective intent. *Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. Of Trs.*, 610 F.3d 558,

565 (10th Cir. 2010). In most cases, "a plaintiff who voluntarily resigns cannot claim that he or she was constructively discharged." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004). Additionally, Plaintiff's burden of proof in a constructive discharge case is "substantial." *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007).

      Plaintiff claims that the environment at work was so toxic that he had to quit for the sake of his physical and mental health. The undisputed facts, however, show that Defendant went beyond its legal obligations to Plaintiff to help him succeed in his employment at BYU. BYU met its legal obligations under the ADA by providing Plaintiff with a reasonable accommodation for his disability of an office with a window and frequent breaks. Moreover, when Plaintiff's behavioral issues caused his supervisors to feel that he was becoming a distraction to the work of the team, BYU made the management decision to transfer him to another department rather than terminating his employment. As noted above, at that time, Plaintiff engaged in the interactive process of discussing his prior accommodation and the modification of that accommodation with his new supervisor Sam Brown.

      Concurrently, however, Plaintiff was making complaints to HR about not having received a raise and expressing his view that past supervisors desired to undermine him and set him up for failure. He did not comply with reasonable requests of management in his new department to acknowledge past behaviors and commit to putting them behind him. Accordingly, the evidence in the record submitted by Defendant shows that in mid-June 2012, Dean Heperi, the head of his new department, made the determination, in consultation with HR, to terminate Plaintiff if he would not sign a final warning letter acknowledging past behaviors and committing to specific steps for improvement as discussed in previous interviews with HR and Dean Heperi and as set out in that final warning letter. The court notes that the steps outlined in that final warning letter

are simply the same expectations that every employee in virtually any workplace would be required to fulfil. Dean Heperi's tentative decision to terminate Plaintiff if he would not sign the final warning letter was not realized, however, because Plaintiff ultimately did sign that letter on July 3, 2012. As a result, management was committed to "wait and see" whether he would demonstrate the discussed improvement during the observation period indicated in the letter.

Nothing in the record approaches "conditions of employment" that are "objectively intolerable." It is not illegal to have an overly corporate and therefore subjectively discouraging working environment. The court is powerless to change an institution's corporate culture. The court sympathizes with Plaintiff and acknowledges that working at BYU with its particular approach to management hierarchy, together with its expectations about what constitutes due deference to authority (and, consequently, what constitutes "negative input" or feedback in intra-team and manager-employee dynamics), simply might not be for everyone. But the court cannot discern any evidence of objectively intolerable conditions of employment that would "force" Plaintiff to quit in this summary judgment record. To the contrary, at all times his immediate supervisors, Dean Heperi, and HR all expressed to him their desire for him to succeed by putting past "critical" or "negative" behaviors behind him; in fact, they gave him the opportunity to do so by transferring him to a new department where he no longer would have to work with the supervisors he was complaining about or with the individuals with whom his personnel file indicates he had had interpersonal difficulties. Accordingly, the court finds that Plaintiff's decision to resign was his own and was not a constructive discharge.

Absent a finding of a constructive discharge, the court cannot find any materially adverse employment action. The record establishes that Dean Heperi made the tentative determination to terminate him in mid-June 2012 if he would not commit to improvement. Plaintiff did commit to

make the required changes and improvements. Thus, no negative employment action was in process against him, nor was any taken. Nevertheless, he never returned to work after July 3, 2012 and resigned on July 20, 2012 despite having been granted FMLA leave through September 2012. The record does not reflect any materially adverse employment action that would meet the requirements of the *prima facie* case for retaliation.

      **B.**      **Causal Connection**

For the avoidance of doubt, the court notes that even if the final warning letter were considered the requisite materially adverse employment action, the record reflects absolutely no "causal connection . . . between the protected activity and the materially adverse action." *Jones*, 502 F.3d at 1193. Plaintiff's argument that his attempted suicide on July 4, 2012 after having signed the final warning letter as well as his allegations that his psychologist advised him to resign from BYU establish this causal connection are unavailing. (*See, e.g.*, Pl.'s Resp. 9, ¶ a [Dkt. No. 31].) These do not prove a "causal connection" between the final warning letter and the disability or "protected activity" of mentioning his prior accommodation of an office with a window in his July 3, 2012 meeting with Dean Heperi for the simple reason that the timeline of events forecloses such a possibility.

As noted, the facts on the record establish that the decision to possibly terminate Plaintiff was made by Dean Heperi (in the event that Plaintiff would refuse to sign the planned final warning letter) on June 15, 2012. It was based on Dean Heperi's dissatisfaction with Plaintiff's behavior since his recent transfer of complaining about not receiving a raise and bad mouthing previous supervisors to HR. This was compounded, for Dean Heperi, by what he took as Plaintiff's obfuscation about his past personnel problems in discussions with him. Dean Heperi interpreted Plaintiff's "negative" behavior of complaining about not receiving a pay raise,

speaking poorly of past supervisors to HR, and, in his view, denying past interpersonal problems as a continuation of previous problematic behavior recorded in his personnel file. Whether Dean Heperi's interpretation and arguably brisk or short response to Plaintiff was evidence of "bad management" the court cannot say on this record, nor is it the court's role to make such a determination. The court finds, however, that the record shows that the tentative decision to terminate Plaintiff had nothing to do with the accommodation that BYU had granted him. Nor can it be the case that this tentative decision (which was ultimately not even put into effect, since Plaintiff ended up signing the final warning letter) resulted from Plaintiff mentioning his prior accommodation during that July 3, 2012 meeting, since that occurred after the tentative decision had already been taken. And the allegation that Plaintiff was transferred in order to give an ADA accommodation of a ground floor office to a female employee recovering from breast cancer is both conclusory and irrelevant given the arguments in the pleadings. Nothing in the record, therefore, shows any prohibited retaliation under the ADA.

### C. Pretext

Even if the record indicated a materially adverse employment action for purposes of establishing the *prima facie* case for retaliation under the ADA, Plaintiff has failed to make the showing of pretext required by the *McDonnell Douglas* burden shifting framework.

"Pretext may be demonstrated by revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable fact-finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason.'" *Morales v. McKesson Health Solutions*, LLC, 136 Fed. Appx. 115, 118 (10th Cir. 2005) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 2004)).

As Defendant notes, "[t]he record is devoid of any evidence that this final warning letter, or any other action taken by BYU relative to Plaintiff, was anything but BYU trying to provide Plaintiff an opportunity for success at his job. It was certainly no pretext for discrimination in any form. As a matter of law, Plaintiff's claim for retaliation fails." (Def.'s Mot. Summ. J. 20 [Dkt. No. 25].) At oral argument, Plaintiff was not able to set forth facts sufficient to create a genuine dispute of material fact about any alleged pretextual reason for the final warning letter. The court finds, therefore, that Plaintiff has not shown pretext and thus would fail to meet the burden of this step in the *McDonnell Douglas* burden shifting framework.

## CONCLUSION

The court GRANTS Defendants' Motion for Summary Judgment (Dkt. No. 25) for the reasons discussed above and dismisses Plaintiff's Complaint (Dkt. No. 2) with prejudice. The court also DENIES as moot Defendant's Objection (Dkt. No. 33) and DENIES Plaintiff's Objection (Dkt. No. 37). This case is closed.

SO ORDERED this 12th day of January, 2015.

BY THE COURT:

_____
Clark Waddoups
United States District Judge